```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
WILLIAM LANGTON,

                        Plaintiff,

        -against-

LESTER WRIGHT, Associate Commissioner,                    REPORT AND
Chief Medical Officer, DOCS, JOHN P. KEANE,               RECOMMENDATION
Superintendent, Woodbourne Correctional
Facility, T.J. MILLER, Deputy Superintendent,             01 Civ. 7400 (SCR) (GAY)
Woodbourne Correctional Facility, FRANK
LANCELLOTTI, Physician, MERVAT MAKRAM,
Physician, Health Care Unit, Woodbourne
Correctional Facility and ALL UNNAMED
PERSONS, INDIVIDUALS, OFFICERS,
CIVILIANS, individually and in their official
capacities,

                        Defendants.
------------------------------------------------------------------X
```

TO THE HONORABLE STEPHEN C. ROBINSON, United States District Judge:

Plaintiff William Langton, proceeding *pro se*, is an inmate of the New York State Department of Correctional Services ("DOCS") and is presently incarcerated at the Woodbourne Correctional Facility. Plaintiff commenced the instant action pursuant to 42 U.S.C. § 1983 on the ground that defendants were deliberately indifferent to his serious medical needs because they delayed in providing him treatment for Hepatitis C ("Hep-C"). Presently before this Court is defendants' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure ("FRCP"). For the reasons set forth below, I respectfully recommend that defendants' motion be granted.

## I. BACKGROUND

The following undisputed facts are gleaned from the parties' statements pursuant to Local Civil Rule 56.1 of the United States District Courts for the Southern and Eastern Districts of New York, from the pleadings and from affidavits, affirmations and exhibits submitted by the parties in support of their contentions.

The Hep-C Virus ("HCV") is the most common chronic blood-bourne infection in the United States. The majority of HCV-infected persons develop chronic Hep-C; the majority of patients with chronic Hep-C do not exhibit symptoms or physical signs of the disease during the first two or more decades after infection. The initial evaluation for presence of the disease in HCV-positive patients should include multiple measurements of ALT (a biochemical indicator of Hep-C) at regular intervals, because ALT activity fluctuates in persons with chronic Hep-C. Many chronic Hep-C patients first exhibit symptoms at the time of development of advanced liver disease. Chronic Hep-C can cause cirrhosis, liver failure and liver cancer.

On March 31, 1999, DOCS issued the Hepatitis C Primary Care Practice Guideline ("HCG"). The HCG was revised on December 17, 1999 and December 13, 2000. According to the HCG, certain groups of inmates are at high risk for developing Hep-C; among those who should be strongly considered for screening are inmates with a history of intravenous drug use.

In early February, 2000, plaintiff underwent blood work ordered by his psychiatrist, Dr. Cuison, for the purpose of detecting abnormalities which could occur as a side effect of the psychotropic medications plaintiff had been taking. The blood test results indicated that plaintiff's ALT level was slightly elevated.

Dr. Makram first treated plaintiff on March 9, 2000 pursuant to his complaints of urinary problems and a rash. On April 11, 2000, plaintiff again sought treatment for a rash; Dr. Makram diagnosed, and prescribed medication for, "bacterial/acne." On April 20, 2000, plaintiff complained to Dr. Makram that the medication prescribed for his acne was not working. Dr. Makram prescribed Accutane, which is very effective in treating severe acne. Dr. Makram noted plaintiff's ALT level from the February blood work and, considering the possible side effects of Accutane, determined that plaintiff's liver enzymes should be tested monthly. At plaintiff's follow-up examination on May 9, 2000, Dr. Makram noted that plaintiff's rash and acne had improved dramatically but plaintiff had dry lips, a side effect of the Accutane. Dr. Makram prescribed a vitamin E lotion and noted that, if plaintiff's dry lips did not improve, plaintiff' dose of Accutane would be lowered. On May 16, 2000, plaintiff's lips were extremely dry, cracking and bleeding; Dr. Makram advised plaintiff to discontinue the Accutane.

The results of blood tests done on June 6, 2000 indicated that plaintiff's ALT level was still elevated. On June 12, 2000, Dr. Lancellotti ordered a Hepatitis panel;[1] plaintiff underwent the blood tests on June 16, 2000. On June 19, 2000, the results of the Hepatitis panel indicated that plaintiff had tested positive for Hep-C. Plaintiff was scheduled the next day for a doctor's appointment on June 29, 2000. On June 29th, Dr. Lancellotti explained the abnormal blood test results to plaintiff and discussed possible treatment. Dr. Lancellotti also scheduled plaintiff for several additional tests for Hep-C to prepare plaintiff for referral to a gastroenterologist.

---

[1] Plaintiff's assertion that Dr. Cuison ordered the June 12th blood work is unsupported by the record.

During the relevant time frame, treatment for Hep-C involved interferon therapy. One side effect of interferon is neuropsychiatric symptoms, including depression. The HCG, therefore, specified that psychiatric clearance was required before initiating Hep-C treatment for patients with a history of major depression or other major psychiatric illness. Accordingly, on June 29th, Dr. Lancellotti also requested psychiatric clearance for plaintiff's Hep-C treatment.[2]

On August 21, 2000, Dr. Lancellotti submitted a Hepatitis C Treatment Request form to Dr. Wright. Dr. Lancellotti indicated on the form that plaintiff had received psychiatric clearance for treatment, even though Dr. Lancellotti did not know the name of the person providing clearance or the date clearance was given.

On or about August 31, 2000, Dr. Lancellotti submitted a request for plaintiff's referral to the gastroenterologist. On September 14, 2000, the decision on said request was stayed pending receipt of additional information, including the date of psychiatric

---

[2] Plaintiff asserts, in his opposition papers, that his "mental health should not have been at question due to a suicide attempt some 17 years ago on or about 1989 and the fact that a treating psychiatrist on July 3, 1989 stated in his prognosis that 'Patient is not considered at risk when sober.'" Memorandum of Law in Support of Plaintiffs' [sic] Affidavit in Opposition for Summary Judgement [sic], at 3. Plaintiff, however, testified at his deposition regarding his ongoing psychiatric treatment as follows: Plaintiff has suffered from depression "more or less" his entire life. In or around 1995, he sought counseling and medication for "heavy depression." Plaintiff has undergone psychiatric treatment "since day one" of his incarceration following his arrest in July 1997. After plaintiff was transferred to Eastern Correction in March 1998, he continued to receive counseling and was prescribed various psychotropic medications at different times, including Zoloft, Atarax, Prozac, Mellaril and Zalexa (ph.), as treatment for his depression and "explosive disorder." Plaintiff was formally diagnosed at Eastern as having "dysthema" which is "like major depression." Plaintiff was transferred to Woodbourne Correction in December 1999 and, since then, has continued psychiatric therapy and medication. See Exhibit A annexed to Declaration of Susan Odessky, at 22, 43-53.

4

clearance. On September 21, 2000, Dr. Lancellotti resubmitted the request for plaintiff's gastroenterology consult. Plaintiff's consultation was scheduled for November 12, 2000; on that day, plaintiff refused to go the appointment and requested that it be rescheduled because he wanted to send his medical records to his family doctor for a second opinion. On November 20, 2000, plaintiff was examined by the gastroenterologist who thereafter completed a consultation form. He noted on the form that plaintiff had chronic Hep-C and that psychiatric clearance was needed before the liver biopsy could be scheduled because of plaintiff's suicide attempt and history of depression.

On February 6, 2001, plaintiff reported to sick call to inquire about the scheduling of his liver biopsy. Plaintiff was scheduled for a follow-up appointment with a doctor on February 16, 2001.

On February 7, 2001, Dr. Makram submitted another Hep-C treatment request form which indicated that psychiatric clearance had not yet been received. At the bottom of the form appeared the following:

> Consultant Report:
> Please note that this inmate has long psych. hx since 1980/1990 for mood disorder/depression mixed w/ anxiety. Hx suicidal attempts in 1980's/1990's. Currently level 2 psych. Under active Rx w/ Prozac/Lithium. Seen by GI on 11/20/00 who was aware of psych hx pending clearance by psych. due to exacerbation of depression/suicidal ideas w/ the use of IFN/Ribavirin.

On February 7, 2001, Dr. Wright appended the following comments to the form:

> With the psych history treatment is problematic. He would absolutely require a specific psych clearance for this specific treatment and probably should be in a Psych Level 1 facility if treated. (He will still need a liver biopsy before treatment as well.)

5

On February 16, 2001, at the scheduled appointment, Dr. Makram told plaintiff that another Hep-C treatment form had been submitted but psychiatric clearance was still needed. A copy of Dr. Makram's Hep-C treatment request form, including Dr. Wright's comments, was sent to Dr. Cuison to emphasize the importance of receiving the clearance.

On or about February 26, 2001, Psychologist Steven Merr conducted a Mental Status Evaluation of plaintiff and sent a written report to the Health Care Unit. The report stated that plaintiff "denies significant depression or anxiety at this time, and it would appear that these symptoms are being fairly well controlled with his current medication regimen." Merr concluded that "if [plaintiff] is approved for treatment with the Interferon Protocol, he will need to be monitored closely for signs of exacerbation of his mood disorder."

The Health Care Unit received Merr's report on March 12, 2001, but rejected it as "psychiatric clearance" on the grounds that it was done by a psychologist and not an M.D. and it failed to definitively clear plaintiff for interferon treatment.[3] Therefore, another request was sent to the mental health department stating precisely that plaintiff's psychiatric clearance had to be issued by an M.D., had to be precisely related to Hep-C treatment and should formulate a plan for mental health department follow-up while plaintiff underwent interferon treatment.

---

[3] Plaintiff asserts that, on July 29, 2005, he was told by Woodbourne Correctional Facility Psychologist George Zahurak that "the psychologist[s] routinely submit the evaluations for patients requiring Hep-C treatment and they are accepted for approval of treatment." Indeed, the HCG specifically states that inmates with a history of major psychiatric illness may not receive interferon-alpha treatment unless cleared by a *psychologist or psychiatrist*.

On April 9, 2001, plaintiff requested an appointment to discuss his Hep-C treatment with a doctor. A doctor's appointment was scheduled for April 30, 2001.

On April 17, 2001, plaintiff filed a grievance concerning the delay of his Hep-C treatment.

On April 19, 2001, upon receipt of "appropriate" psychiatric clearance from Dr. Cuison, a completed criteria form was e-mailed to Dr. Wright and plaintiff's April 30th doctor's appointment was canceled. The request for consultation regarding plaintiff's liver biopsy was submitted and approved; plaintiff's liver biopsy was scheduled for May 21, 2001.

On April 20, 2001, T.J. Miller, Deputy Superintendent of Administration at Woodbourne, reviewed plaintiff's grievance and responded as follows: "Re: Remedy Requested. Per Medical (NA Boyd) on 4/20, a request to schedule a biopsy has been submitted. A decision to provide treatment will be made per HSPGM[4] criteria thereafter." On April 24, 2001, the Inmate Grievance Resolution Committee ("IGRC") issued the following decision regarding plaintiff's grievance: "Committee recognizes grievant's action requested and hasn't the authority to award monetary damages. However, the committee agrees with the decision by Dep. Miller for the scheduled biopsy and subsequent treatment."

On April 25, 2001, plaintiff appealed the IGRC's decision to Woodbourne Superintendent John Keane. On May 3, 2001, Keane responded (1) that plaintiff's request for damages was beyond the scope of the grievance program and (2) "The

---

[4] DOCS' Health Services Hepatitis C protocol.

grievant's action requested for further treatment is accepted in that a biopsy request was submitted by the medical department. If approved, the grievant will be scheduled and treatment rendered based on test results." On or about May 4, 2001, plaintiff appealed Keane's decision to the Central Office Review Committee ("CORC").

On May 21, 2001, plaintiff's liver biopsy was done at Albany Medical Center. The pathologist's diagnosis was noted on the pathology report as "chronic hepatitis, mildly active." The Health Care Unit at Woodbourne received the pathology report on May 31, 2001. Dr. Makram reviewed the report and submitted a follow-up referral to the gastroenterologist for recommendations as to the course of plaintiff's Hep-C treatment.

On June 6, 2001, the CORC unanimously denied plaintiff's grievance with clarification. The CORC noted, *inter alia*: plaintiff received psychological clearance on February 26, 2001; the medical staff requested a biopsy appointment on April 20, 2001; the biopsy was completed on May 21, 2001; plaintiff was approved and will be scheduled for a gastroenterology appointment to determine if the treatment is necessary.

On August 13, 2001, plaintiff was seen by the gastroenterologist, who recommended that plaintiff undergo a twelve-month course of treatment. Woodbourne received plaintiff's Hep-C medication on August 21, 2001 and began plaintiff's course of treatment on or about August 24, 2001. Plaintiff completed his Hep-C treatment in August, 2002. Plaintiff underwent blood testing on September 19, 2002; according to the lab results dated September 22, 2002, the Hep-C virus was not detected.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FRCP 56(c). Specifically, the party seeking summary judgment has the burden of demonstrating that no genuine issue respecting any material fact exists. LaFond v. General Physics Servs. Corp., 50 F.3d 165, 171 (2d Cir. 1995). "[T]he movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995). If the moving party meets its burden, the burden shifts to the opposing party to come forward with "specific facts showing that there is a genuine issue for trial." FRCP 56(e).

When deciding a summary judgment motion, the court must "view the evidence in the light most favorable to the party against whom summary judgment is sought and . . . draw all permissible inferences in favor of that party." Fischl v. Armitage, 128 F.3d 50, 55 (2d Cir. 1997). The question is whether, in light of the evidence, a rational jury could find in favor of the nonmoving party. Gallo v. Prudential Residential Servs., Ltd. Partnership, 22 F.3d 1219, 1224 (2d Cir. 1994). Summary judgment must be denied, therefore, if the court finds "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, 477 U.S. 242, 250 (1986).

Further, because Langton filed this action *pro se*, the Court must judge his submissions by a more lenient standard that accorded to "formal pleadings drafted by

lawyers." Haines v. Kerner, 404 U.S. 519, 520 (1972). See Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994) (The Court must read a pro se party's "supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest."). This liberal standard, however, "is not without limits, and all normal rules of pleading are not absolutely suspended." Stinson v. Sheriff's Dep't of Sullivan County, 499 F. Supp. 259, 262 (S.D.N.Y. 1980). In other words, Langton's *pro se* status does not relieve him of the usual requirements of summary judgment. See Lee v. Coughlin, 902 F. Supp. 424, 429 (S.D.N.Y. 1995) (citation omitted) (a "pro se party's 'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment"); Kadosh v. TRW, Inc., No. 91 Civ. 5080 (PKL), 1994 WL 681763, at *5 (S.D.N.Y. Dec. 5, 1994) ("The work product of pro se litigants should be generously and liberally construed, but [the pro se's] failure to allege either specific facts or particular laws that have been violated renders his attempt to oppose defendants' motion ineffectual.").

### III. OFFICIAL CAPACITY CLAIMS

Plaintiff asserts claims against defendants in their official and individual capacities. "It is black letter law that a suit against a state official in his official capacity seeking damages is barred by the Eleventh Amendment . . . ." Denis v. New York State Dep't of Corr. Servs., No. 05 Civ. 4495, 2006 WL 217926, at *12 (S.D.N.Y. Jan. 30, 2006) (quotation and citation omitted) (citing cases). Accordingly, I conclude, and respectfully recommend, that plaintiff's claims for damages against defendants in their official capacities must be dismissed.

## IV. INDIVIDUAL LIABILITY: DEFENDANTS KEANE AND MILLER

In order to establish personal liability under 42 U.S.C. §1983, plaintiff must prove, inter alia, that the defendant caused the deprivation of plaintiff's rights. See Taylor v. Brentwood Union Free Sch. Dist., 143 F.3d 679, 685 (2d Cir. 1998) (citing Monell v. Department of Social Servs., 436 U.S. 658, 692 (1978), cert. denied, 119 S. Ct. 1027 (1999). The Second Circuit has identified five ways in which a defendant may be personally involved in a constitutional deprivation so as to be liable under §1983: (1) the defendant directly participated in the infraction; (2) the defendant, after learning of the violation through a report or appeal, failed to remedy the wrong; (3) the defendant created, or allowed the continuance of, a policy or custom under which unconstitutional practices occurred; (4) the defendant was grossly negligent in managing subordinates who committed unconstitutional acts; or (5) the defendant exhibited deliberate indifference by failing to act on information indicating that unconstitutional acts were occurring. See Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995).

Here, plaintiff asserts that Keane and Miller implemented and enforced the HCG and were responsible for training medical personnel regarding Hep-C treatment. Said assertions are vague, conclusory and unsupported by the record and, therefore, are insufficient to establish Keane and Miller's personal liability. Plaintiff also contends that Keane and Miller are liable because they were made aware, through plaintiff's grievance, that the medical department had wrongfully delayed plaintiff's Hep-C treatment but failed to intervene. "[I]t is well settled that prison supervisors cannot be held personally liable when the sole allegation is that they received letters or grievances. . . . Were it otherwise, virtually every prison inmate who sues for

11

constitutional torts by [prison officials] could name the [supervisor] as a defendant since the plaintiff must pursue his prison remedies, and invariably the plaintiff's grievance will have been passed upon by the [supervisor]." Williams v. Koenigsmann, No. 03 Civ. 5267, 2005 WL 1115426, at *5 (S.D.N.Y. May 10, 2005) (quotation and citation omitted). In any event, "a prison administrator is permitted to rely upon and be guided by the opinions of medical personnel concerning the proper course of treatment administered to prisoners, and cannot be held to have been 'personally involved' if he does so." Joyner v. Greiner, 195 F. Supp.2d 500, 506 (S.D.N.Y. 2002). In sum, plaintiff proffers no evidence which would support a finding that either Superintendent Keane or Deputy Superintendent Miller were personally involved in the alleged deprivation of plaintiff's Eighth Amendment rights. Accordingly, I conclude, and respectfully recommend, that all claims against defendants Keane and Miller should be dismissed.

## V. DELIBERATE INDIFFERENCE

Plaintiff seeks damages under 42 U.S.C. § 1983 against Dr. Lancellotti, Dr. Makram and Dr. Wright for their alleged deliberate indifference to his medical needs in violation of the Eighth Amendment. In order to establish an Eighth Amendment claim for deliberate indifference, plaintiff must satisfy both an objective and a subjective component. See Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998). Objectively, plaintiff must demonstrate that his medical condition is sufficiently serious. See Brock v. Wright, 315 F.3d 158, 162 (2d Cir. 2003). Subjectively, plaintiff must prove that defendants knowingly disregarded this threat to his health. See Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994).

A. <u>Subjective Component</u>

In order to satisfy the subjective component, plaintiff must demonstrate that the health care providers knowingly and intentionally rendered improper treatment. <u>See</u> <u>Farmer v. Brennan</u>, 511 U.S. 825, 837 (1994). "Negligence, even if it constitutes medical malpractice, does not, without more, engender a constitutional claim." <u>Hathaway v. Coughlin</u>, 99 F.3d 550, 553 (2d Cir. 1996). Moreover, it is well-settled that "mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." <u>Chance</u>, 143 F.3d at 703 (citation omitted).

Plaintiff alleges that the defendants were deliberately indifferent because they refused to initiate plaintiff's Hep-C interferon treatment without psychiatric clearance to do so. Plaintiff specifically contends that his "mental health should not have been at question" and, therefore, that defendants' requirement of psychiatric clearance "did not derive from sound medical judgment." Contrary to plaintiff's assertions, the undisputed record evidence indicates that plaintiff sought psychiatric treatment for depression upon his incarceration in 1997, that he received ongoing treatment in the form of counseling and various psychotropic medications, and that said treatment continued throughout the relevant time frame. Further, plaintiff does not dispute that Interferon treatment could exacerbate depression. Therefore, defendants' requirement of psychiatric clearance prior to initiating plaintiff's Hep-C treatment was a medical judgment defendants made to ensure that Hep-C treatment was appropriate for plaintiff. Based on the undisputed evidence, it appears that defendants were acting in plaintiff's best interest; at worst,

13

defendants' requirement of psychiatric clearance could be categorized as a negligent medical judgment (although this strains reason) which does not rise to the deliberate indifference standard necessary to sustain an Eighth Amendment claim. Accordingly, there is no basis to conclude that defendants acted with deliberate indifference in requiring psychiatric clearance.

Plaintiff also argues that defendants unnecessarily delayed his Hep-C treatment because psychiatric clearance was obtained in August 2000. There is a question of fact as to whether defendants received psychiatric clearance in August 2000, February 2001 or April 2001. Moreover, a jury could draw a negative inference from the fact that, according to defendants, "appropriate" psychiatric clearance was received on April 19, 2001–two days after plaintiff filed his grievance. Plaintiff further contends that, on or about September 11, 2000 ("in the heat of an argument"), Dr. Lancellotti stated "It's a wonder you get anyone to treat you with your attitude Mr. Langton. Maybe when you grow up you'll find yourself being treated for Hep-C." See Affidavit in Opposition, ¶ IV. Nonetheless, assuming *arguendo* that a reasonable jury could conclude that any of the defendants knowingly and intentionally rendered improper treatment, plaintiff's claim fails because he cannot satisfy the objective component.

### B. Objective Component

"It is well-established that Hepatitis C qualifies as a serious condition for purposes of an Eighth Amendment analysis." Pabon v. Wright, No. 99 Civ. 2196, 2004 WL 628784, at *5 (S.D.N.Y. Mar. 29, 2004). However, where a plaintiff alleges that he suffered from a delay in treatment rather that a complete lack of treatment, as does plaintiff in the instant case, "it is appropriate to focus on the challenged *delay* or

14

*interruption* in treatment rather than the prisoner's *underlying medical condition* alone in analyzing whether the alleged deprivation is, in objective terms, sufficiently serious to support an Eighth Amendment claim." Smith v. Carpenter, 316 F.3d 178, 185 (2d Cir. 2002) (quotation and citation omitted) (emphasis in original). Consequently, in order to satisfy the objective component of his claim, plaintiff must demonstrate that he suffered harm because his Hep-C treatment was delayed. See Graham v. Wright, No. 01 Civ. 9613, 2004 WL 1794503, at *4-5 (S.D.N.Y. Aug. 10, 2004).

The gist of plaintiff's argument is that, although he was eligible for Hep-C treatment on August 21, 2000, defendants improperly denied him treatment until April 19, 2001. Even assuming, *arguendo*, that defendants obtained psychiatric clearance on August 21, 2000, plaintiff proffers no evidence from which a reasonable jury could conclude that he suffered any harm from the delay in Hep-C treatment. In the first instance, plaintiff offers no medical evidence in support of his contention that he suffered liver damage as a result of the delay in treatment. Further, the undisputed medical records reflect that plaintiff's blood tested negative for HCV on September 19, 2002, following the completion of his course of Hep-C treatment. Plaintiff concedes that, as of March 3, 2005, HCV has been undetectable in all of his subsequent blood tests. Plaintiff also contends that the delay in treatment put a strain on his mental health which left him "confused and depressed." However, pursuant to section 1997e(e) of the Prison Litigation Reform Act, "a prisoner may not recover damages for mental or emotional injuries suffered while in custody without a prior showing of a physical injury." See Hall v. Perilli, No. 03 Civ. 4635, 2004 WL 1068045, at *8 n.2 (S.D.N.Y. May 13, 2004). In sum, the record is devoid of evidence from which a rational jury could

15

conclude that plaintiff suffered the objective harm necessary to establish his claim. Accordingly, I conclude, and respectfully recommend, that plaintiff's deliberate indifference claim should be dismissed.

## VI. CONCLUSION

For all of the foregoing reasons, I respectfully recommend that defendants' motion for summary judgment should be **granted** and plaintiff's amended complaint dismissed.

## VII. NOTICE

Pursuant to 28 U.S.C. § 636(b)(1)(B), as amended, and Rule 72(b), Fed. R. Civ. P., the parties shall have ten (10) days from receipt of this Report to serve and file written objections to this Report and Recommendation. If copies of this Report are served upon the parties by mail, the parties shall have thirteen (13) days from receipt of this Report to file and serve written objections. See Fed. R. Civ. P. 6(e). Such objections, if any, shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of The Honorable Stephen C. Robinson at the United States District Court, Southern District of New York, 300 Quarropas Street, White Plains, New York, 10601, and to the chambers of the undersigned at said Courthouse.

Failure to file timely objections to this Report and Recommendation will preclude later appellate review of any order of judgment that will be entered. See Small v, Secretary of H.H.S., 892 F.2d 5, 16 (2d Cir. 1989).

Requests for extensions of time to file objections must be made to the Honorable Stephen C. Robinson and not to the undersigned.

Dated: April 17, 2006
White Plains, New York

Respectfully Submitted,

_George A. Yanthis_
GEORGE A. YANTHIS, U.S.M.J.